1 | Sean B. Berberian (#020775)
Paul D. Ticen (#024788)
2 | **WHITE BERBERIAN PLC**
60 E. Rio Salado Parkway, Suite 900
3 | Tempe, Arizona 85281
Tel: (480) 366-5933
4 | Fax: (480) 718-8368
Email: sberberian@wbazlaw.com
5 | Attorneys for Creditors/Defendants Aberdeen Animal
6 | Hospital, P.C., Thom Myers, and Kristy Myers

7

**IN THE UNITED STATES BANKRUPTCY COURT**
8
**FOR THE DISTRICT OF ARIZONA**
9

10 | In re | Chapter 7

11 | MAXART ANIMAL HEALTH, INC., | Case No. 08-00993-GBN

12 | Debtor,
| Adv. No. 09-01203-GBN
13

14

15 | | **DEFENDANTS' RESPONSE TO PLAINTIFF BROWN'S MOTION FOR SUMMARY JUDGMENT**
16 | ROGER W. BROWN, CHAPTER 7 TRUSTEE |

17 | Plaintiff,

18 | v.

19 | ABERDEEN ANIMAL HOSPITAL, PC;
20 | THOM MYERS and KRISTY MYERS, husband and wife,

21 | Defendants.

22

23

24 | Aberdeen Animal Hospital, P.C., Thom Myers, and Kristy Myers (collectively, "Aberdeen" or

25 | "Defendants") hereby submit their response to Plaintiff Roger W. Brown's Motion for Summary

Judgment.
26

27

28

Plaintiff's Motion for Summary Judgment should be denied. Plaintiff's Motion asks the Court to work a complete injustice. Debtor correctly recognized Aberdeen as a secured creditor prior to filing bankruptcy, as well as in its bankruptcy schedules, and then also after filing bankruptcy. Now, due to an apparent technical error in the filing of the UCC statement by Debtor's prior counsel, the trustee seeks to have Aberdeen stripped of money it was entitled to receive. Aberdeen's owners, Dr. and Mrs. Myers, have lost $700,000—virtually all of their retirement money—due to Debtor's mistakes and breach of contract. Aberdeen should not be further harmed by stripping it of the limited funds it did receive from Debtor. Aberdeen is entitled to keep those funds and be recognized as a secured creditor in this case.

Plaintiff's Motion for Summary Judgment should be denied in its entirety because: (1) Aberdeen is a secured creditor, with a clear secured interest in Debtor's assets, perfected by an equitable lien; and (2) payments made by Debtor to Aberdeen during the preference period were in the ordinary course of business and therefore are not avoidable as preferential payments. Aberdeen has a secured interest in Maxart Animal Health, Inc.'s business assets. As part of the purchase of the Aberdeen veterinary clinic from Aberdeen, Debtor signed all sales documents, including a security agreement with a UCC Financing Statement. Debtor was required to file the UCC statement. The Debtor and its counsel either misfiled the UCC Financing Statement or failed to do so. In either case, Defendants have an equitable lien because the parties intended that Defendant have a secured interest by both express contract and implied through conduct. Therefore, Plaintiff's claim for recovery based on Defendant being an unsecured creditor is unavailing.

Furthermore, the Debtor's payment of two installment payments to Aberdeen during the preferential period was done in the ordinary course of business, therefore, they are not avoidable preferential payments. The Debtor purchased Defendants' business for $800,000 with the entire purchase price carried by a promissory note and secured with a security agreement. The purchase price was to be paid by Debtor to Aberdeen in monthly installment of $7,530.40. During the preference period, two installments of this sum were paid by Debtor to Aberdeen pursuant to the agreement.

Therefore, Plaintiff's claim that Defendants must return the preferential payments is unavailing. In sum, Plaintiff's Motion for Summary Judgment should be denied in its entirety.

The Response is supported by the following Memorandum of Points and Authorities, the accompanying Defendants' Response to Plaintiff's Statement of Facts and Defendants' Supplemental Statement of Facts, Plaintiff's Statement of Facts, and the entire court file.

RESPECTFULLY SUBMITTED this 22nd day of November, 2010.

**WHITE BERBERIAN PLC**

By:   /s/ Sean B. Berberian
          Sean B. Berberian
          Paul D. Ticen
          60 E. Rio Salado Parkway, Suite 900
          Tempe, Arizona 85281
          Attorneys for Creditors/Defendants

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.        FACTUAL BACKGROUND

Defendants owned and operated a veterinary clinic known as Aberdeen Animal Hospital (Defendants' Supplemental Statement of Facts ("SSOF") ¶ 1). On September 15, 2004, Defendants sold the entire business to Debtor for $800,000. (SSOF, ¶ 2). The entire balance was carried by a promissory note and secured by a security agreement, UCC Financing Statement and Personal Guarantee. (SSOF, ¶ 3). These documents were incorporated by the Asset Purchase Agreement to form the entire agreement (hereinafter referred to collectively as "sale documents"). (SSOF, ¶ 4). Defendants were unrepresented by counsel at the time of closing, but Debtor was represented by counsel. (SSOF, ¶ 5). Debtor's counsel, consistent with Debtor's contractual obligations, informed Defendant that he would file the UCC Financing Statement. (SSOF, ¶ 6). The Promissory Note at ¶ 2 states that the agreement is "secured by a Security Agreement and UCC-1 Financing Statement of even date over the assets," and that the Debtor, at Defendants' request, will "give, execute, deliver, file and/or record any notice, statement, instrument, document, agreement, or other papers that the

[Defendants] may reasonable request in order to create, preserve, perfect or validate any security interest granted pursuant hereto . . . . (SSOF, ¶ 7). Aberdeen requested that the UCC statement be filed (SSOF, ¶ 8), and Debtor was required by contract to file the statement. (SSOF, ¶ 9). But the Debtor either misfiled or failed to file the Financing Statement. (SSOF, ¶ 10). This mistake was not discovered until after Debtor commenced bankruptcy proceedings. (SSOF, ¶ 11). Once Defendants discovered Debtor's contractual breach, they immediately filed the Financing Statement on April 29, 2008 in the amount of $698,348.59. (SSOF, ¶ 12).

Regardless of the UCC statement's filing or misfiling, Debtor and Aberdeen considered Aberdeen to be a secured creditor of Debtor. (SSOF, ¶ 13). Pursuant to the Sale Documents, Debtor began making monthly installment payments of principal and interest in the amount of $7,530.40 on or about October 1, 2004. (SSOF, ¶ 14). From October 2004 up until the preferential period of November, December and January 2007-2008, Debtor made this monthly payment. (SSOF, ¶ 15). Debtor made two payments during the preferential payment. (SSOF, ¶ 16). After Debtor filed bankruptcy, for numerous months, Debtor continued making post-petition payments. (SSOF, ¶ 17). But Debtor halted payments when it apparently discovered that the UCC Financing Statement was not properly filed. (SSOF, ¶ 18).

**II**. **ARGUMENT**

### A. Defendants are Secured Creditors Because They Possess an Equitable Lien on the Business Assets Sold to Debtor on September 15, 2004.

Defendants are secured creditors under the Bankruptcy Code and applicable law because they have a lien on business assets sold to Debtor. "An allowed claim of a creditor secured by a lien on property in which the estate has an interest … is a secured claim …." 11 U.S.C.A. § 506 (a)(1). Plaintiff now seeks recovery of funds Debtor paid Aberdeen, alleging Aberdeen is an unsecured creditor because its lien was not perfected before Debtor commenced bankruptcy. Although it appears that Debtor breached its contractual obligations by misfiling or failing to file the Financing Statement with the Arizona Secretary of State, Defendants still have a valid lien on the Debtor's business assets and therefore the post-petition payments were proper. Debtor's breach and apparent failure to properly

file the UCC statement cannot be permitted to strip Aberdeen of its secured creditor status that the parties clearly intended it to have.

Defendants maintain an equitable lien on Debtor's business assets, which preserves their status as secured creditors in Debtor's bankruptcy. "[An] equitable lien is a right over property constituting an encumbrance, so that the property itself may be proceeded against in an equitable action and either sold or sequestered upon proof of a contract out of which the lien could grow or of a duty on the part of the holder so as to give the other party a charge or lien on it. *In re Farnsworth*, 384 B.R. 842, 849 (Bkrtcy. D. Ariz. 2008). It can arise different ways, including by express contract and the parties' conduct. *Id*. at 849-850. An equitable lien exists here through contract and the conduct of Debtor.

An equitable lien by express contract arises when the parties intend "to charge or appropriate particular property as security for an obligation." *Id*. at 850. The contract is read as a whole to ascertain this intention. *Kalmanoff v. Weitz*, 8 Ariz. App. 171, 172, 444 P.2d 728, 729 (1968). Their intention, rather than the form of the contract, controls whether an equitable lien arose. *Id*. In the absence of an express contract, a court can imply from the parties conduct that they intended to charge particular property for payment of a debt. *In re Farnsworth*, 384 B.R. at 850. Further, the equitable lien relates back to when the express or implied agreement occurred. *Id*.

Here, Defendants' equitable lien in Debtor's business assets arose by both express agreement and through their conduct. The sale documents demonstrate clear intent that the parties intended for the $800,000 obligation to be secured by the assets sold to the Debtor. The Security Agreement's plain language reflects the parties' intent. It is beyond dispute that the Sales Documents show the clear intent of the parties to create a secured interest. Defendant Aberdeen is expressly referred to throughout the document as the 'Secured Party." (SSOF, ¶ 19). Further, the language clearly and unambiguously grants Defendant Aberdeen a security interest in the "collateral"[1] to secure the

---

[1] Collateral is defined in the Security Agreement as "all present and after-acquired goods and personal property owned by the Debtor, in the nature of equipment, supplies, furniture, fixtures, leasehold improvements, cash, accounts receivable, contract rights, prepaid expenses, records and fils, and other miscellaneous tangible and general intangibles, in all forms, wherever located, including any substitutions, additions thereto and replacements thereof, including insurance proceeds relating in any way to the business currently known as Aberdeen Animal Hospital, or any successor thereto … (the "Business Premises") including, but not limited to those items listed in Exhibit 1 attached [thereto] … [and] [a]ll of the

Debtor's obligations under the contact, including payment of the $800,000 promissory note and a lien. (SSOF, ¶ 20). Further, the parties' conduct demonstrates their clear intent for Defendants to be secured creditors. Debtors made the $7,530.40 monthly installment payment beginning October 2004 and continued paying this specific sum through the preferential period and for several months post-petition. Moreover, Debtor listed Aberdeen as a secured creditor in its petition schedules. (SSOF, ¶ 21). Had Debtor not believed that Aberdeen was a secured creditor, Debtor would not have made the preferential and post-petition payments, nor would Debtor have listed Aberdeen as a secured creditor.

Applicable law supports the recognition of an equitable lien on Debtor's business assets. In *Farnsworth*, the court held that a creditor had an equitable lien on money he had contributed toward the debtor's down payment for a home. 384 B.R. 842, 846, 848 (Bkrtcy. Ariz. 2008). The debtor objected to the creditor's claim that he was a secured creditor. *Id.* at 846. The creditor had only filed and recorded a notice of *lis pendens* a year before the debtor filed the bankruptcy petition. *Id*. at 847-848. The court held that the creditor's equitable lien related back to the date he recorded the *lis pendens*, defeating both the Trustee's strong-arm rights and the debtor's homestead exemption. *Id.* at 848.

Further, in *Destro v. Stuhley*, a creditor held two promissory notes made by a debtor and secured by deeds of trusts on the debtor's property. 675 F.2d 1037, 1038 (9th Cir. 1982). Before bankruptcy had commenced, a new promissory note was to have been signed by the debtor and a new deed of trust recorded. *Id.* The debtor, however, failed to sign the new promissory note after the creditor performed his obligations. *Id*. Once the bankruptcy petition was filed, the trustee argued that the creditor was unsecured because his lien was unperfected. *Id*. at 1039. However, the creditor argued that he had an equitable lien in the property, and his interests were superior to those of the trustee. *Id*. The 9th Circuit held that the creditor had an equitable lien in the property because the ***parties had intended for the creditor to have a secured interested*** and the ***debtors had failed to perform their obligations by signing the promissory note***. *Id*.

Debtor's rights, title and interest that the Debtor has as lessee or tenant in any lease relating to the Business Premises (the "Lease").

As shown by *Farnsworth* and *Destro*, when the parties intended to create a secured interest, a creditor will be deemed secured through an equitable lien, even where the liens were unperfected. Just as in *Destro*, Aberdeen must be recognized as a secured creditor through an equitable lien. Indeed, the facts of this case are even more compelling than in Farnsworth and Destro, because Debtor signed all the documents effectuating the secured interest—but merely failed to abide by its contractual duty to file the UCC statement. Aberdeen, like the *Destro* creditor, fully performed their obligations under the contract. Aberdeen fully performed its duties, transferring all business assets to Debtors. The Debtors failed to perform a contractual obligation like the debtors in *Destro*, here, by failing to properly file the UCC Statement.

Defendants are secured creditors because they too have an equitable lien in Debtor's business assets. Here, basis for recognition of an equitable lien is even more compelling, as the contract expressly states that Aberdeen has a security interest and there are no concerns with statute of frauds or other doctrines unique to real property. All of the equities in this case compel the recognition of Aberdeen as a secured creditor.

### B. Debtor's Payments to Aberdeen During the Preferential Time Period Were Made in the Ordinary Course of Business, Therefore, They Are Not Recoverable.

The two payments made by Debtor to Aberdeen during the preference period are not recoverable by Plaintiff, as they were clearly made in the ordinary course of business. Bankruptcy Code's "ordinary course of business" exception applies and the action to recover the preference period payments is without merit. Furthermore, Debtor only made two payments to Aberdeen during the preference period, not three, as Plaintiff claims.

1.      Debtor's Payments to Aberdeen Were Made in the Ordinary Course of Business.

The trustee has the burden of making his prima facie case under § 547(b) that a preference period payment is recoverable. However, even then, exceptions apply which prohibit recovery under the defenses enumerated in § 547(c). *In re Jan Weilert RV, Inc*., 315 F.3d 1192, 1197 (9th Cir. 2003). The "ordinary course of business" defense prohibits recovery of payments made in the ordinary course

of business. §547(c)(2). The purpose behind this defense is to leave normal financial relationships undisturbed because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy. *Union Bank v. Wolas*, 502 U.S. 151, 160, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991), *In re Ahaza Systems, Inc*. 482 F.3d 1118, 1125 (9th Cir. 2007) (quotations omitted). "The ordinary course exception deters the race to the courthouse and enables the struggling debtor to continue operating its business." *In re Jan Weilert RV, Inc*., 315 F.3d at 1197.

For the rule to apply, Aberdeen need only show that the payments were: (1) for debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee; 2) made in the ordinary course of business; and 3) made according to ordinary business terms. § 547(c)(2), *In re Food Catering & Housing, Inc*. 971 F.2d 396, 398 (9th Cir. 1992) (quotations omitted). These three elements are easily met in this case, as the payments were made in the ordinary course for payments on the promissory note for the sale of the veterinary clinic to Debtor.

### *a.*        *Prong One Is Met: "Debt Incurred in Ordinary Course of Business"*

The basic inquiry, which is clearly met in this case, is whether the debt was incurred in a typical, arms-length commercial transaction that occurred in the marketplace. *In re Johnston Industries, Inc*. 357 B.R. 907, 915 (Bkrtcy. M.D. Ga. 2006). The "debt incurred" prong may be satisfied by first-time transactions between debtor and creditor.[2] *In re Ahaza Systems, Inc*., 482 F.3d at 1125. The key inquiry for first time transactions is whether the debt incurred would be out of the ordinary for a person in the borrower's position. *Id.* Usually, the inquiry is into prior instances of debt between the particular parties or prior dealings with similarly situated parties. *Id*., at 1126. But in circumstances involving first-time transactions, courts employ a more general analysis as to whether the debt is similar to that expected to be seen between parties where a debtor is not sliding into bankruptcy. *Id*.

---

[2] The court refers to subsections (A), (B) and (C) to § 547(c)(2). By 2005 amendment (Pub.L. 109-8, § 409(1), §547(c)(2) was rewritten to only include subsections (A) and (B) but there was no change to the substance and wording of §547(c)(2).

Here, the debt in question was clearly incurred in the ordinary course of business. The debt was incurred by Debtors in purchasing Aberdeen's business many years prior to Debtor's petition for bankruptcy. The entire purchase price of $800,000 was financed. Debtor made a promissory note payable to the order of Defendants, which was secured by "collateral" as defined by the Security Agreement. It is undoubtedly very common for debt to be incurred in this fashion. Businesses change hands all the time, and typically the seller becomes a creditor for all or a portion of the purchase price through a promissory note and security agreement. Thus, this type of credit transaction would be expected to be seen between the parties.

**b.** *Prong Two Is Met: "Payments Made in Ordinary Course of Business"*

The payments made by Debtor to Aberdeen were in the ordinary course of business. Courts typically consider the following four factors to determine whether payments made are ordinary relative to past practices: (1) the length of time the parties were engaged in the transactions; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and, (4) whether the creditor took advantage of the debtor's deteriorating financial condition. *In re Ahaza Systems, Inc*., 482 F.3d at 1129. A delay in payment is particularly relevant in taking a payment outside the ordinary course of business exception. *In re Food Catering & Hous., Inc*., 971 F.2d at 398, *In re Ahaza Systems, Inc.* 482 F.3d at 1129 -1130. But late payments are still made in the ordinary course of business when there is a history and pattern of late payments between the parties. *In re Youthland, Inc*., 160 B.R. 311 (Bkrtcy. S.D. Ohio (1993).

This prong is clearly met, just as in *In re L. Bee Furniture Co., Inc*., 203 B.R. 778, (Bkrtcy. M.D. Fla. 1996). In *L. Bee Furniture*, the debtor borrowed $150,000 from a creditor , which was paid back through equal monthly installment payments by a specific date. *Id*. at 779. Here, Debtors were paying Aberdeen equal monthly installment payments on or about the 12th day of every month. In both the L. Bee Furniture case, like this one, the trustee attempted to recover the amount of installment payments made during the 90-day window. *Id*.

The court held that the "payment made" prong was satisfied. First, the debtor had a pattern of paying late, not just during the preferential period. *Id*. at 782. Two, the amount paid during the

preferential period was substantially the same as the preceding payments. *Id*. Three, the creditor

overcome the presumption that late payments are outside the ordinary course of business by showing

that payments, which were late on average over twenty-days, were the ordinary course of their

business. *Id*. at 782-783. Last, the payments did not result from "unusual" or "extraordinary" debt

collection practices. *Id*. at 783. The creditor sent invoices to debtor prior to the due date, late notices

once due and followed up with phone calls over the life of the loan. *Id*.

Here, the installment payments were due the 1st of every month, but the Debtors paid on or

about the 12th of every month dating back to the March 12, 2007 payment. This pattern of late

payment would rebut any argument that late payments are outside the ordinary course of business. In

fact, the range of late days is much wider in the *L. Bee Furniture* case then is seen here. Also, the

amount paid ($7,530.40) during the preferential period, is identical to what has always been paid.

Last, payments made during and before the preferential period were made by Debtor to Aberdeen

through an Automated Clearing House (ACH) transaction. Thus, it is clear that the November and

December 2007 payments were made in the ordinary course of Debtors' business.

### c. *Prong Three Is Met: Industry Standards.*

The payments made by Debtor to Aberdeen during the preference period were made in ordinary

industry standards. "[T]he payment must be ordinary in relation to prevailing business standards." *In*

*re Jan Weilert RV, Inc. at 1197* (internal quotations omitted). "If the terms in question are ordinary for

industry participants under financial distress, then that is ordinary for the industry." *Id.* It is those

range of terms [encompassing] the practices in which firms similar in some general way to the creditor

in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be

deemed extraordinary and therefore outside the scope of this prong." *Id*.

The creditor is not faced with a high burden in meeting this prong. *In re*

*Healthcentral.com*, 504 F.3d 775, 791 (9th Cir. 2007). This element is only important where the

"record of prior conduct of the debtor and transferee is so random and haphazard that it yields no

reasonable, ascertainable boundaries." *In re Cocolat, Inc,176 B.R. 540, 550 (*Bkrtcy. N.D. Cal. 1995*).*

Where parties have a short history of dealings, a creditor can fill in the gap by reference to more

extensive and exacting analysis of industry standards. *In re Forklift LP Corp*., 340 B.R. 735 (Bkrtcy. D. Del. 2006). A creditor who establishes a steady and lengthy relationship with a debtor involving terms that have not significantly changed during the prepetition insolvency period will be able to depart substantially from the range of terms established under objective industry standard. *In re Molded Acoustical Products, Inc*., 18 F.3d 217 (3rd Cir. 1994). Courts have even taken judicial notice that payments made during the preferential period comported with industry standards. See *In re Magic Circle Energy Corp*., 64 B.R. 269, 275 (Bkrtcy. W.D. Okl. 1986).

Here, the debtor paid defendants for nearly three years and thirty-six monthly installments before the preferential period. There is a clearly established history of systematic payments between the Debtor and Aberdeen. Nothing changed during the presumed period of insolvency. Aberdeen would also respectfully request that the Court take judicial notice that the sale of a small business where a buyer gives a note promising to make monthly installments to a seller toward the purchase price falls within the range of industry standards for these types of transactions. There is nothing extraordinary or unique about this arrangement. In either event, the evidence in this case demonstrates that payments were made within the ordinary business terms relevant to the sale of a small business.

### 2. The Debtor Made Two Payments, Not Three, in the Ninety Days Before Commencing Bankruptcy.

Debtor filed a petition for Chapter 11 protection on February 1, 2008. (SSOF, ¶ 22). Thus, the trustee may attempt to avoid payments made by the Debtor to Defendants beginning November 1, 2007 until the date of petition. Debtor made two (2) payments of $7,530.40 on November 13 and December 12, 2007 respectively. (SSOF, ¶ 23). No other payment was made to Aberdeen until after February 1. (SSOF, ¶ 24). The October 12, 2007 payment falls outside the 90-day window and therefore is not avoidable under the basis argued by Plaintiff. Thus, only $15,060.80 is at issue in the preference claim made by Plaintiff, not $22,591.20. Regardless, all preference period payments were made in the ordinary course of business and cannot be recovered by Plaintiff.

## III.   CONCLUSION

Plaintiff's Motion for Summary Judgment should be denied in its entirety because: (1) Aberdeen is a secured creditor, as it has an equitable lien on Debtor's business assets; and (2) payments made by Debtor to Aberdeen were in the ordinary course of business and therefore are not avoidable as preferential payments.

RESPECTFULLY SUBMITTED this 22nd day of November, 2010.

**WHITE BERBERIAN PLC**

By:   /s/ Sean B. Berberian

Sean B. Berberian
Paul D. Ticen
60 E. Rio Salado Parkway, Suite 900
Tempe, Arizona 85281
Attorneys for Creditors/Defendants
Aberdeen Animal Hospital, P.C., Thom
Myers, and Kristy Myers

1

2    I hereby certify that on November 22nd, 2010, I electronically transmitted the attached

3    documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of

4    Electronic Filing to all CM/ECF registrants in the case, including but not limited to:

5

6    Kenneth M. Motolenich-Salas
     LANE & NACH, P.C.
7    2025 North Third Street, Suite 157
     Phoenix, Arizona 85004
8    Attorneys for Roger W. Brown, Trustee

9

10    /s/  Sean B. Berberian

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28